**Michelle N. Lipkowitz**
202 434 7448
mnlipkowitz@mintz.com



555 12th Street NW
Suite 1100
Washington, DC  20004
202 434 7300
mintz.com

December 8, 2022

**VIA CM/ECF and HAND-DELIVERY**
The Honorable George L. Russell, III
United Stated District Judge
United States District Court for the District of Maryland
101 W. Lombard Street
Baltimore, Maryland 21201

>  Re: *United States v. Rosen*, Case No. 1:22-cr-00177-GLR-1
>  Response to Government's Sentencing Memorandum

Dear Judge Russell:

I write in response to the Government's December 4, 2022 Sentencing Memorandum, and in anticipation of the sentencing scheduled to take place in this matter on December 15, 2022, at 9:30 am.  In summary, the government asks the Court to sentence Dr. Rosen to a period of home detention, while tacitly admitting that doing so could cause severe, irreparable harm to his fragile health.  Here, no period of home detention is necessary as Dr. Rosen displayed the utmost character when he willingly relinquished his DEA license almost five (5) years ago, when his prescribing practices were challenged; deterrence has been effected; and it is in the government's best interest to help keep Dr. Rosen engaged and healthy so that he can be available for cooperation, if and when necessary.

Dr. Rosen has acknowledged and taken responsibility, including via his plea agreement, for the mistakes he made as to four (4) patients. It is for those four (4) patients alone which he must be punished by this Court at sentencing. In turn, the Court should reject the government's invitation to visit retribution on Dr. Rosen for unproven allegations, and the actions of others.

**I.    The Facts:  Dr. Rosen Helped Thousands of Patients Through the Cutting Edge, Multi-Disciplinary Pain Management Practice He Created and Managed.**

Dr. Rosen has assisted thousands of people.  He has alleviated the pain and suffering of many individuals, and families.   He has helped thousands of people and families live fuller lives.

**MINTZ**

December 8, 2022
Page 2



He has helped thousands of people return to work, be able to support their families, and serve as productive members of society.

1. **Becoming Dr. Rosen.**

Dr. Rosen was born in Baltimore. His parents divorced when he was two-years-old, right after his sister was born; after which, he did not have contact with his father. He was raised by his single-mother in downtown Baltimore, living in close proximity to his maternal grandparents. Dr. Rosen grew up in a diverse neighborhood. As one of the last white neighbors on Broadway, he was determined to stand up for desegregation, and to do the morally right thing, proudly participating in the Read Drugstore's Sit-In in 1955. Dr. Rosen has always been inspired to help those in need. He feels that responsibility to this day.

Dr. Rosen was inspired to become a doctor by medical resident tenants to whom his grandmother rented her third floor. After obtaining his undergraduate degree from John's Hopkins University, Dr. Rosen matriculated through medical school at the University of Maryland. Dr. Rosen received his medical license in 1963. Dr. Rosen has resided in Maryland his entire life, except when he voluntarily served in the Navy as a physician from 1964 – 1966, when he was honorably discharged; and when he lived in California from 1966 - 1968. He has taken many postgraduate courses, and had specialties in sports injury, sports medicine, rehabilitation, skeletal problems, fibromyalgia, and workers' compensation cases.

Dr. Rosen was a Fellow of the American Academy of Physical Medicine and Rehabilitation, where he served as the Chairman of the Special Interest Group on Myofascial Pain, and as the Secretary and Treasurer of the Maryland Society of Rehabilitation. He was an active member of the American Academy of Pain Management, and the American Society of Addiction Medicine, for many, many years. Unlike pill mill owners and many other providers, he lectured and published widely on multiple topics pertaining to pain, addiction, return to work, sports medicine, and wellness; among numerous other topics.

2. **Rosen-Hoffberg Rehabilitation and Pain Management Associates (the "Practice").**

Always determined to help those most in need, Dr. Rosen started his cutting-edge Practice in the mid-1970s. Dr. Rosen dedicated his career to helping an extremely challenging, severely underserved community – treatment-resistant patients who had been rejected and/or failed prior treatment elsewhere. These patients often suffered with multiple physical, emotional, and social disorders that had not gotten better with the passage of time, despite treatment. Dr. Rosen was determined to do what it took to help this population rejected by others - provide the fulsome,

**MINTZ**

December 8, 2022
Page 3



patient empowerment-focused treatment necessary, including all wrap-around services. In turn, the Practice was truly revolutionary, Dr. Rosen was the first physiatrist in private practice in the Baltimore area to put together a multi-disciplinary private practice, providing a wide variety of physical, cognitive-behavioral, manual, and educational services.

The Practice's Mission was to "provide comprehensive and effective care for all persons served presenting with pain and disabilities in an attempt to improve their quality of life and restore them to the highest level of functioning possible." *See* Mission Statement at p. 5 of Patient Handbook, attached hereto as **Exhibit A**. As noted in its Patient Handbook, multiple copies of which were available in the waiting areas of the Practice:

> Pain affects so many areas of a person's life. It affects work performance and limits total working hours, thus creating financial problems which creates emotional stress. Pain affects family relationships because you cannot act like your *old self*. It affects your sex life, hobbies and sleeping patters.
>
> Pain affects your self-esteem, your confidence and future hopes. You feel depressed and anxious about your health…
>
> Our common goal is pain relief as quickly as possible. Because your pain is serious, we treat it seriously. This is why we have designed your treatment program the way it is – intensive, rigorous and comprehensive.

Patient Handbook, **Exhibit A**, at 17.

In turn, the Practice was structured to recognize the importance of the therapeutic process in learning to manage pain; and the importance of keeping people in treatment in order to achieve long-term results, rather than discharging or abandoning them when they most needed help. The Practice viewed it not as the pain being important to understand, but rather the patient who has the pain. In turn, the Practice used cognitive behavioral strategies to empower patients, and stressed physical and emotional wellness through life-style changes, including weight-reduction, smoking cessation, and empowerment through exercise. The Practice was also suboxone-certified, and used medication assisted treatment in dual-diagnosis disorders, whenever possible, along with mental health counselling. Additionally, the Practice, unlike many other pain clinics, did not shy away from providing end-of-life care, including end-stage care of terminal patients who had pain.

**MINTZ**

December 8, 2022
Page 4



Rosen's Rules were a direct result of this patient empowerment-focused approach. More specifically, Rosen's Rules highlight that in order to empower the patient to be able to successfully take care of and protect himself or herself, "helping the patient is our lowest priority," as the goal is to help the patient build a foundation, with teaching the patient how to help himself or herself being the first priority. Consistent with this theme, "the Customer [wa]s always right," in order to build a strong relationship of empowerment, with it being the goal of the Practice to provide the support and resources to help the patient make the best decision. *See* Rosen's Rules, attached hereto as **Exhibit B**.

As a result of this patient-focused, individualized, personalized care, the Practice experienced considerable success in serving as a high-quality, well-recognized center of excellence in the community, allowing Dr. Rosen to share his experience through publishing and lecturing to innumerable professional audiences on the subjects of pain, rehabilitation, myofascial pain, wellness, return to work, electro-diagnostic studies, and disability management, among many other topics.

It is important to note that despite the challenging nature of the treatment-resistant patients on which the Practice focused, and the large size of the Practice, which would necessarily place it in the higher-end of opioid prescriptions[1], the Practice provided care to thousands of patients for decades, with only a handful of concerns being raised to the Board of Physicians. Similarly, while the government notes that as of 2016, large retail pharmacies such as CVS and Target refused to honor any prescription written by Dr. Rosen, it fails to note the context – litigation that CVS and Target were facing – and that similar letters were sent to dozens and dozens of medical practices.

It is undisputed that the Practice's patient population included addicts, some patients who had illicit street drugs in their system, such as cocaine and heroin, and patients who had no drugs in their system; the Practice did not abandon these needy patients – which could have led to catastrophic results - rather it increased the frequency of appointments, decreased the prescriptions, and increased the required physical therapy sessions, and sessions with a social worker, often up to multiple times per week – all for monitoring and mentoring. *See* ECF 9, Stipulation of Facts, at 1.

Notably, the recently revised, 2022 CDC Guidelines point out that this group of patients is at high-risk for suicide and punitive behavior, and abandonment; and counsels for a multi-

---

[1] In addition to the large size of the Practice, the treatment-resistant population, and the treatment of terminally-ill patients, the Practice's program for tapering prescriptions required prescriptions with a higher pill count, but lower concentration; all of which necessarily led to a higher overall pill count for the Practice.

**MINTZ**

December 8, 2022
Page 5



disciplinary, patient-centered, individualized, comprehensive, management.[2]  A copy of the CDC's 2022 Guidelines is attached hereto as **Exhibit C**.  More specifically, Recommendation 5 states that "[f]or patients already receiving opioid therapy, clinicians should carefully weigh benefits and risks and exercise care when changing opioid dosage.  If benefits outweigh risks of continued opioid therapy, clinicians should work closely with patients to optimize non-opioid therapies while continuing opioid therapy.  If benefits do not outweigh risks of continued opioid therapy, clinicians should optimize other therapies and work closely with patients to gradually taper to lower dosages or, if warranted based on the individual circumstances of the patient, appropriately taper and discontinue opioids.  Unless there are indications of a life-threatening issue such as warning signs of impending overdose (e.g., confusion, sedation, or slurred speech), opioid therapy should not be discontinued abruptly, and clinicians should not rapidly reduce opioid dosages from higher dosages (recommendation category: B; evidence type: 4)." *Id.* at 13-14.

Similarly, Recommendation 8 states that "[b]efore starting and periodically during continuation of opioid therapy, clinicians should evaluate risk for opioid-related harms and discuss risk with patients. Clinicians should work with patients to incorporate into the management plan strategies to mitigate risk, including offering naloxone (recommendation category: A; evidence type: 4).  *Id*. at 19.  This is precisely the type of practice-management in which Dr. Rosen engaged for his entire career.

It cannot go without noting that the Practice always aimed to be in full compliance with the CDC's then-current Guidelines, as well as the standards enunciated by the Federation of State Medical Boards, the Chou Guidelines of The American Pain Society, The American Academy of Pain Medicine, and other Pain Guidelines, including those for Interventional Medicine, which encourages its members to only perform interventional procedures on reliable patients, and to refer high-risk patients to facilities such as the Practice.

Given the Practice's patient population, especially the segment working on self-empowerment and taking responsibility for his or her actions and health, it is not surprising that the government could find anonymous patients to say negative things about the Practice; however, this is a very small group in comparison to the thousands of patients and families who sing Dr. Rosen's praises for saving their lives, families, and jobs.  Similarly, it is not surprising that the government could find neighboring businesses, many of which would have a "not in my backyard" mindset for any pain practice, which would opine negatively and refer to the Practice as a "pill mill."  As a matter of fact, this very issue is addressed in the Patient Handbook wherein the Practice

---

[2] https://www.cdc.gov/mmwr/volumes/71/rr/rr7103a1.htm?s_cid=rr7103a1_w

**MINTZ**

December 8, 2022
Page 6



notes multiple complaints, reminds patients that they are invited guests, and reinforces expectations, rules and requirements.  *See* Patient Handbook, **Exhibit A**, at 2.

In addition to the above, other fundamental ways in which the Practice was different from many other pain clinics and pill mills include the high volume of referrals from other doctors; not prescribing opioids on the first appointment; conducting thorough medical exams; testing for aberrant results; helping patients taper from opioids, when appropriate; not accepting cash payments; accepting insurance, Medicare and Medicaid; not seeing patients under the age of 21, without a parent; affiliated doctors paying their taxes; and affiliated doctors making appropriate salaries (less than 50% of the average salary for a physician in Maryland).

### 3. Norman Rosen Now.

Dr. Rosen is an 84 year-old man, with significant health challenges, who has accepted responsibility for the wrongdoings outlined in his plea agreement.  After dedicating almost 50 years to the care of treatment-resistant patients, in February 2018, when his prescribing practices were first challenged, he *willingly relinquished* his DEA License.  Even though he had no plans to retire, he did so not because he believed he had done anything wrong at that time, but because a concern had been expressed, and he is always committed to doing the right thing.

At this point, almost five (5) years later, Dr. Rosen is a shell of his former self.  On February 27, 2018, at around 7 a.m., the FBI and DEA showed up, *en masse*, at the Towson and Owings Mills locations of the Practice, with search warrants.  Over the course of the day, dozens and dozens of agents occupied the offices, interviewed witnesses, and seized materials.  This highly-public raid was all-over the news.  Dr. Rosen's decades-long, hard-earned reputation – from both a professional and personal perspective - was irreparably destroyed, in an instant.

What we are left with is an 84 year-old who lives alone in a cluttered condo worth approximately $305,533, and drives a 9 year-old car.  *See* ECF 12, PSR, at 10.  Dr. Rosen suffers from currently very unstable high blood pressure; a variety of musculoskeletal problems; a high calcium score; atrial fibrillation; benign prostatic hyperplasia; a right bundle branch block; as well as a history of blood clots in his lungs.  He is currently on blood thinners and other heart medication.  He underwent surgery on his prostate in April 2022, and is on medication for the same.  He is on a plethora of other medication.   He was hospitalized at Sinai Hospital for acute atrial fibrillation/flutter related to COVID-19 in June 2021, and subsequently underwent a coronary artery bypass graft surgery earlier this year.  In order to stay healthy, he walks approximately 3 - 5 miles as close to five (5) days per week as possible; and dances for cardio at least five (5) days per week.



As you will see from the dozens of letters submitted by Dr. Rosen's character references, he is known to be kind, deeply generous, deeply caring, open-minded, and curious. He is described as being open-hearted and judgment-free. He listens, he asks questions. He looks for the best in people, and works with them so that others can see the same. He has an insatiable appetite for innovation and progress in his field, and for his patients. He believes deeply that good medical care is a basic human right, including for patients abandoned by others. He prioritized prescription-free treatment, when possible; and used medication to bridge patients while they worked on the psychological, social, and physical aspects of their care. As you will read, Dr. Rosen routinely helped disabled patients who had been written-off by others, but improved under his care to the extent that they were able to return to work or volunteer activities, and family activities. Dr. Rosen would never knowingly hurt anyone. His instincts were always in the best interest of his patients. He is a modest person, living a modest lifestyle, who was never motivated by money. He is fundamentally decent, and altruistic. His ethics and character are beyond reproach. He has unwavering integrity, and a deep sense of commitment. *See* Character References, attached hereto as **Exhibit D**.

## II. The Court Should Not Consider the Uncharged Conduct against Dr. Rosen.

Uncharged conduct should not be automatically considered during sentencing. "[F]ederal district judges have power in individual cases to disclaim reliance on acquitted or uncharged conduct." *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc). Dr. Rosen's is a case in which the Court should exercise its discretion to decline to consider uncharged conduct. Courts have "urged prosecutors not to . . . seek enhanced sentences by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted." *United States v. Fischer*, 905 F.2d 140, 142 (7th Cir. 1990). That should not happen here. The government investigated Dr. Rosen for more than three (3) years. At the conclusion of its investigation, the government drafted, and the parties negotiated, a stipulation of facts upon which Dr. Rosen's plea agreement was executed. Additionally, pursuant to the DOJ's *Justice Manual*, "[i]f a prosecution is to be concluded pursuant to a plea agreement, the defendant should be required to plead to a charge or charges that, among other things, is "the most serious readily provable charge consistent with the nature and extent of [the defendant's] criminal conduct." Justice Manual § 927.430.

### 1. The Government Faces a High Bar to Prove that a Doctor Illegally Prescribed Medication.

Four (4) patients are included in Dr. Rosen's plea agreement. Any additional or uncharged conduct would require the government to meet the difficult legal standard of proving that a doctor criminally distributed drugs, as the mere fact that a physician prescribed opioids is not a crime.



To be criminal, a doctor's prescribing practices must amount to drug dealing under 21 U.S.C. § 841, and it is the elements of that crime the government needs to prove for the Court to rely on the uncharged conduct. *United States v. Allere*, 430 F.3d 681, 687 (4th Cir. 2005) (noting that "in order to convict on the distribution and drug conspiracy charges, the jury was obliged to find beyond a reasonable doubt that the defendants were selling drugs, or conspiring to do so, and not practicing medicine"). *See also, United States v. Smith*, 267 F.3d 1154, 1166 (D.C. Cir. 2001) (analyzing elements of perjury charge where government sought to increased sentence based on uncharged perjury allegations).

Drug-dealing charges cannot rest on the vague sense that a doctor prescribes opioids too often, or in excessive quantities. The government must prove that, in relation to specific prescriptions written for specific patients, a doctor prescribed a medication other than for a legitimate medical purpose and not in the course of usual medical practice. *United States v. Brizuela*, 962 F.3d 784, 791, 796 (4th Cir. 2020); *Id.* at 791 (explaining that charges concerned 21 prescriptions written for 5 patients). Additionally, the government must further prove "specific intent." *Id.* A doctor who "dispenses a drug in good faith in medically treating a patient" does so for a legitimate medical purpose . . . ." *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1138 (4th Cir. 1994). In cases where accused of distributing drugs, the government attempts to prove its case through the testimony of a medical expert, and the doctor is provided a chance to present his or her own expert testimony in defense. *See United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017) ("Expert testimony on whether prescriptions are medically appropriate has long been the norm in controlled-substance prosecutions.").

This bar is even higher after the United States Supreme Court ruling in *Ruan v. United States*, No. 20-1410, Slip Op.; 597 U.S. __ (2022) (9-0 decision), a copy of which is attached hereto as **Exhibit E**. In summary, on June 28, 2022, through *Ruan*, the Supreme Court made it harder for prosecutors to win convictions of doctors accused of running "pill mills" and excessively prescribing opioids and other addictive drugs by requiring the government to prove that defendants knew their prescriptions had no legitimate medical purpose. *Id.* The 9-0 ruling sided with Petitioners, who argued that their trials were unfair because jurors were not required to consider whether the two convicted doctors had "good faith" reasons to believe the numerous opioid prescriptions were medically valid. *Id.* In turn, the Court held that 'Section 841's 'knowingly or intentionally' *mens rea* applies to the statute's 'except as authorized' clause. Once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at 4–16.

In essence, a patient's subjective belief that Dr. Rosen did something wrong is insufficient to prove any uncharged conduct; our system does not criminalize doctors (or even impose civil



liability) based on patient complaints. Without thorough review of medical records, it is impossible for any expert physician, much less the Court, to determine that Dr. Rosen's prescriptions, at the time he wrote them, were not for a legitimate medical purpose.

### 2. The Court Should Not Consider the Conduct of Others Already Sentenced.

The Court should not now consider the conduct of Dr. Hoffberg and William Soyke, both already sentenced, in its sentencing of Dr. Rosen.

Dr. Howard Hoffberg was already sentenced by this Court for receiving kickbacks from a pharmaceutical company, Insys, Inc., in exchange for prescribing Subsys. *See United States v. Hoffberg*, GLR-21-178 (D. Md.). Dr. Hoffberg worked primarily out of the Practice's Owings Mills location, while Dr. Rosen worked primarily out of its Towson office. Unlike Dr. Hoffberg, Dr. Rosen did not prescribe Subsys. Dr. Rosen did not know, nor has he ever admitted to knowing that Dr. Hoffberg was prescribing Subsys in exchange for money from Insys. Consistent with his plea agreement, Dr. Rosen only acknowledged that he "was aware that Howard Hoffberg had entered into arrangements with multiple pharmaceutical companies in which Hoffberg received monetary payments for giving lectures." *See* ECF 9, Stipulation of Facts, at 1.

Additionally, William Soyke, a nurse practitioner at the Practice, pled guilty to overprescribing oxycodone, and sexually assaulting female patients. Mr. Soyke was sentenced to 37 months in prison. *See United States v. Soyke*, RDB-19-291 (D. Md.). While the Government's Sentencing Memorandum notes that "Dr. Rosen was made aware of complaints against Soyke, he did not terminate him but rather allowed him to continue to work at the Practice," Dr. Rosen's plea agreement is devoid of the same. *See* ECF 15, Government's Sentencing Memorandum, at 2.[3]

The government has had its opportunity to punish Dr. Hoffberg and Mr. Soyke, it should not now be permitted to seek justice against one man for the alleged misconduct of another.

### 3. The Court Should Reject Any Attempt by the Government to Hold Dr. Rosen Responsible for the Opioid Epidemic in Maryland.

Dr. Rosen did not create the problem of pain; or the over-use of opioids in pain management; or the problems associated with limited educational, motivational and social resources; or addiction, diversion, and other illegal activities. To the contrary, he was committed to dealing with the problem of pain and pain management; and, more importantly, to dealing with

---

[3] It is notable that Dr. Rosen required Mr. Soyke to get mental health counseling, and took all female patients off of Mr. Soyke's schedule.

**MINTZ**

December 8, 2022
Page 10



the people who have pain, as well as other complex disabilities, in addition to their pain problem. In the last ten years, there has been a 44% decrease in the prescription of opioids, yet the country is facing a worsening epidemic of drug-related overdoses and deaths.[4] The government shuttered Dr. Rosen's practice almost five (5) years ago, and overdoses in the State and nationwide have continued to rise. The reason for this tragedy is not prescription medication, but rather an increase in "illicit fentanyl, fentanyl analogs, methamphetamine and cocaine, as illustrated by data from the [CDC]."[5]

### III.  The Guidelines:  We Concur with the Government, Which Agrees with The PSR, But Seeks A Downward Departure Under U.S.S.G. § 5K1.1.

Dr. Rosen agrees with the guidelines calculations outlined in the government's Sentencing Memorandum, including the one-level deduction under U.S.S.G. § 5K1., based on Dr. Rosen's substantial assistance to the government.  *See* ECF 15, Government's Sentencing Memorandum, at 3.  We also note that, consistent with the same, and the operative plea agreement, including the fact that the government's 5K motion triggers a c-plea range, with 0 to 6 months being "the appropriate disposition of this case…with the limitation that any such sentence imposed be served as home confinement," in order for Dr. Rosen to be available if and when the government needs him, Dr. Rosen needs reliable access to medical care, and to maintain a healthy life-style. *Id*; *see also* ECF 8, Plea Agreement, at 4, ¶5.  Along these lines, his doctor supports his current exercise schedule, which includes walking approximately 3 - 5 miles as close to five (5) days per week as possible; and dancing for cardio at least five (5) days per week.  *See* Letter from Dr. Frank H. Morris at The Heart Center at Lutherville, attached hereto as **Exhibit F**.

### IV.  The Relevant 3553(a) Factors Militate In Favor Of The Low-End of the Agreed-Upon Sentence of 0-6 Month of Home Confinement.

We respectfully submit that under the relevant 3553(a) factors, a sentence of significantly less than six (6) months of home confinement as a condition of supervised release is warranted.  In this case, in weighing the balancing factors here, including the good Dr. Rosen has done for thousands, with the damage that he has caused, at most, Dr. Rosen should be confined for a brief period of time in his conservative condo.  He does not live in a large, lavish home.

---

[4] Kevin B. O'Reilly, *44% Drop in Opioid Rx Since 2011, but Overdoses Spike. Here's Why*, Am. Med. Ass'n (Sept. 28, 2021), https://www.ama-assn.org/delivering-care/overdose-epidemic/44-drop-opioid-rx-2011-overdoses-spike-here-s-why.

[5] *Id.*

**MINTZ**

December 8, 2022
Page 11



      In terms of the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), Dr. Rosen pled to less than ideal treatment of four (4) out of thousands and thousands of patients. In turn, when the Court balances the "history and characteristics" of the defendant under 18 U.S.C. § 3553(a)(1), no period of confinement is necessary. First, we agree with the government, "[pu]t simply, a prison setting could have deleterious and, frankly, deadly effects on his health…justice does not require incarceration in this case, for this defendant, on these facts, particularly given the defendant's uniquely poor health situation. Case in point… Dr. Rosen's health status is precisely the kind of picture for which relief would be warranted under 18 U.S.C. § 3582(c)(1)(A)." *See* ECF 15, Government's Sentencing Memorandum, at 3.

      Second, while the government deems home confinement within the agreed-upon range appropriate because it will impose some restrictions on Dr. Rosen's liberty, without imposing harsh and potentially deadly sequelae on his health, we are concerned about the same as Dr. Rosen lives alone, and he needs reliable access to medical care, and to be able to do his best to maintain his health through walking and dancing. Accordingly, we ask the Court to take mercy on Dr. Rosen and sentence him to no more than thirty (30) days of home confinement, which we think is the outer boundary from a health concern perspective.

      We are confident that this sentence, along with all of the other deterrence-related aspects of this unique matter, provides effective deterrence pursuant to 18 U.S.C. § 3553(a)(2)(B). Dr. Rosen clearly understands that with great power comes great responsibility, and that the abuse of medical prescribing privileges cannot be permitted to occur with impunity. However, as outlined by the government, the impact of a criminal conviction, Dr. Rosen's permanent loss of licensure, and the shuttering of the Practice almost five (5) years ago, has served as a sufficient general deterrent to other doctors in the community. Dr. Rosen has not been in a position to prescribe Controlled Substances since he willingly relinquished his DEA License in 2018; in turn, he took full ownership of his concerning behavior and divested himself of the ability to engage in this kind of behavior.

      Unlike many others, Dr. Rosen did not continue to practice and earn an income up until sentencing; to the contrary, despite having no plans to retire, he gave it all up – immediately. Encouraging others to own their behavior, early and often, is a strong deterrent. In order to encourage this behavior, Dr. Rosen needs to be given credit for willingly relinquishing his DEA License; never seeking to have it reinstated; and not practicing medicine for one day thereafter.

      Similarly, we believe that this sentence avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). While the government notes that Mr. Soyke received 37 months of imprisonment, Mr. Soyke's conduct involved sexual assault, which is not alleged here as to Dr. Rosen. Also, while Dr. Hoffberg received eight (8) months in prison, Dr. Hoffberg lacked the same kind of health


challenges as Dr. Rosen.  Additionally, Dr. Hoffberg was able to continue practicing medicine and to earn an income for his family from 2018 through 2022. The facts here are very different. Accordingly, we do not believe that a sentence at the low-end of the 0-6 month agreed-range would create any unwarranted sentence disparities.

### V.     Character Witnesses.

Based on the Government's December 4, 2022 Sentencing Memorandum, we intend to call the following Character Witnesses at sentencing on December 15, 2022:

1. Lauren Rosen
2. Jaime Rosen
3. Lee Gresser, MD, FAAFP
4. Michael Hayes, MD
5. Donna Pasqua
6. Janice Reuling
7. Marcia Donald

### VI.    Conclusion.

With all of the good Dr. Rosen has done throughout his life, on top of timely accepting responsibility and substantially cooperating with the government, imposing a sentence at the low-end of the agreed-range of 0 to 6 months of home confinement range, at or around thirty (30) days, will be imposing a sentence that is sufficient but not greater than necessary under all of the applicable 3553(a) factors.

Sincerely,

*Michelle N. Lipkowitz*

Michelle N. Lipkowitz
Member

*Not admitted to practice in the District of Columbia.  Working under the supervision and guidance of members of the Bar of the District of Columbia.  Admitted to practice in the State of Maryland only.*